UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | |
|---|---|
| JOSEPH AGUNBIADE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Cause No. 1:16-cv-1915-WTL-TAB |
| | ) |
| CHAMBERLAIN COLLEGE OF NURSING, | ) |
| | ) |
| Defendant. | ) |

## ENTRY ON MOTION FOR SUMMARY JUDGMENT

This cause is before the Court on the motion for summary judgment filed by Defendant Chamberlain College of Nursing ("Chamberlain") (Dkt. No. 46). The motion is fully briefed and the Court, being duly advised, **GRANTS** Chamberlain's motion.

### I. STANDARD

Federal Rule of Civil Procedure 56(a) provides that summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." In ruling on a motion for summary judgment, the admissible evidence presented by the non-moving party must be believed, and all reasonable inferences must be drawn in the non-movant's favor. *Zerante v. DeLuca*, 555 F.3d 582, 584 (7th Cir. 2009) ("We view the record in the light most favorable to the nonmoving party and draw all reasonable inferences in that party's favor."). However, a party who bears the burden of proof on a particular issue may not rest on its pleadings, but must show what evidence it has that there is a genuine issue of material fact that requires trial. *Johnson v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003). Finally, the non-moving party bears the burden of specifically identifying the relevant evidence of record, and "the court is not required to scour the record in

search of evidence to defeat a motion for summary judgment." *Ritchie v. Glidden Co.*, 242 F.3d 713, 723 (7th Cir. 2001).

## II. FACTUAL BACKGROUND

The facts of record viewed in the light most favorable to Agunbiade, the non-moving party, are as follow.[1]

The Chamberlain College of Nursing is a nursing school that offers bachelor, master, and doctoral degree programs in nursing. In January 2014, Plaintiff Joseph Agunbiade began his studies at Chamberlain in pursuit of a bachelor of science degree in nursing. Agunbiade took classes at Chamberlain's Indianapolis campus.

### A. Wallace's Comment

In late March 2014, Agunbiade was in a class taught by Professor Sarah Wallace. Agunbiade was the only foreign student, the only male student, the only black student, and the only student with an accent in the class. During the class, Wallace made a statement that Agunbiade deemed racially offensive. She said something along the lines of "Can you imagine a black friend that cannot even pronounce the word 'potassium'?"[2] Wallace's comment made

---

[1] Agunbiade repeatedly cites findings made by the Indiana Civil Rights Commission ("ICRC") in a proceeding he had initiated against Chamberlain, in which the ICRC determined that "there is probable cause to believe that a discriminatory practice occurred as alleged. Dkt. No. 61-3 (emphasis in original). The findings, however, are inconsistent in many respects with the uncontroverted evidence in the record before the Court. Therefore, the ICRC findings are not sufficiently reliable to be considered as evidence of the truth of the matter asserted therein, and the Court has not considered them in resolving the instant motion. *See Silverman v. Bd. of Educ. of City of Chicago*, 637 F.3d 729, 732-33 (7th Cir. 2011), *overruled on other grounds by Ortiz v. Werner Enters., Inc.*, 834 F.3d 760 (7th Cir. 2016) (determining that the EEOC's findings were not probative in the summary judgment analysis).

[2] Agunbiade could not recall if Wallace used the term "black friend," but he remembered Wallace said something "relating to a minority group."

Agunbiade uncomfortable, although he did not believe that Wallace was referring to him when she made it.

Two or three days later, Agunbiade reported Wallace's comment to Ivy Sawyer, Chamberlain's student services advisor. Sawyer encouraged Agunbiade to speak directly to Wallace. Although Agunbiade did not want to make the incident about himself because Wallace had not mentioned his name, Agunbiade spoke to Wallace about the incident and asked her to not make such comments. According to Agunbiade, "[w]hen she refused, [he] said 'can you talk to Geoff [Robinson]?' her immediate boss, the student affairs coordinator." Dkt. No. 61-1 at 12.

The next time the class met, Wallace told the class that she was not happy that somebody in the class went to the administration about what she had said and that she would prefer that students address such issues directly with her. She also apologized to the class for the comment. Agunbiade felt that the class was looking at him when this occurred. After the class ended, Agunbiade approached Wallace, told her that he had reported her comment, and apologized to Wallace for doing so. Wallace responded, "That's ok. Joseph, that's ok." Agunbiade considered the conversation to have ended amicably. Wallace made no other statements that he considered to be racially offensive. Agunbiade later received a passing grade in this class.

### B. NR324-Adult Health I

During the January-February 2015 session, Agunbiade enrolled in NR324-Adult Health I. Professor Lynn Patton was his clinical educator for the course. Agunbiade and the other students supervised by Patton were placed at IU Health – Methodist Hospital.

During the first week of the session, Patton found that Agunbiade met the minimal student nurse expectations for this level of the program. However, during the following weeks, Agunbiade demonstrated difficulty understanding how to formulate a nursing diagnosis; conduct

a focused assessment; monitor patient outcomes; form nursing interventions; and provide a safe environment for patients. Specifically, Patton found that Agunbiade needed to improve his ability to effectively communicate to all members of the health care team, including other members of his clinical group, instructors, and staff of the facility. Several of the facility's health care staff reported they found Agunbiade difficult to understand and reluctant to share information in a timely manner. Patton also found that Agunbiade needed to improve his ability to critically think through task prioritization, noting that he demonstrated difficulty receiving shift reports and was frequently tardy in providing care to his assigned patients, and had missed important tasks such as vital signs and medication administration.

On three separate occasions, the health care team at the hospital reported to Patton that Agunbiade had requested to use hospital equipment (a stethoscope) that he was expected to provide for himself. Such actions were inappropriate, as Chamberlain expects each student to either utilize the equipment provided by Chamberlain or acquire their own equipment for use in the clinical environment.

Patton found that Agunbiade needed to improve his completion of assigned tasks. He would frequently engage other members of his clinical group to complete tasks he had been assigned to do (bed baths, vital signs, patient positioning, cleaning soiled patients). She found that he became defensive with other members of his clinical group in post-conference sessions and would frequently offer excuses rather than solutions.

Patton concluded that Agunbiade was not providing a safe environment for patients in his care. On one occasion, he missed a required medication administration. When questioned about his error, Agunbiade responded that he did not see a problem with missing this task. On another occasion, Agunbiade assisted a telemetry patient from the bed to a chair. This patient's chart

said that she was to remain in her bed. Agunbiade did not engage the chair alarm or place the call light within the patient's reach. Agunbiade also removed the telemetry leads from the patient, preventing the hospital staff from monitoring the patient's heart. Agunbiade's actions placed the patient in significant danger, as the doctor had ordered the patient's heart to be constantly monitored. When asked about the incident, Agunbiade again did not see a problem with his actions.

Agunbiade reported that on one occasion, Patton asked Agunbiade how he would prioritize all the tasks that he was to do that day and he had difficulty doing so. Patton told him that she would ask him again later. Agunbiade then spoke to another student and asked her how she would prioritize her tasks, and the student told him what she told Patton. Agunbiade memorized what the student had said and gave the memorized information to Patton when she saw him again. Patton informed Agunbiade that the other student had relayed their conversation and that Agunbiade's actions were inappropriate.

Agunbiade was the only student who could not access the computer system at the hospital. During the clinical, each student was assigned an access code for charting purposes and was expected to create a personalized password for this system.[3] According to Agunbiade, all of the students' passwords failed initially. All the other students eventually got into the computer system, but he does not know how they did so. Patton worked with him on two different occasions during the first week of the clinical in an effort to help him get computer access, but her efforts were unsuccessful. Patton concluded that Agunbiade could not remember his password, and thought that Agunbiade acted as if it was the instructor's responsibility to

---

[3] Agunbiade adds detail to this process, stating that "the students were either sent to security a day or two before beginning a clinical rotation to get their passwords, or received the passwords through the mail." Dkt. No. 60 at 3-4.

maintain his password. After two attempts to reset Agunbiade's password, Patton determined that Agunbiade was responsible for the lack of access to the system.[4] Patton instructed Agunbiade to contact her when he was ready to view the patients' information on the computer system, though the parties dispute whether he did so. Agunbiade never contacted the technical assistance personnel at the hospital to assist him; Agunbiade believed that Patton had to go with him to receive technical assistance, but did not do so when asked. Agunbiade also acknowledged that he was unable to access the computer system in another class with another professor in another hospital.[5]

As a result of the issues she perceived with Agunbiade's performance, Patton gave Agunbiade an unsatisfactory evaluation. This evaluation caused Agunbiade to receive a failing grade in NR324-Adult Health I. On February 16, 2015, Agunbiade appealed his failing grade. According to Agunbiade, Patton treated him in a manner that he perceived as biased and unfair, compared to the "friendly and compromising disposition she showed toward other students in the group." Dkt. No. 60 at 10. Chamberlain denied Agunbiade's appeal, citing complaints from the hospital staff and other students, as well as patient safety concerns. Agunbiade retook the class and passed it.

---

[4] Agunbiade objects to Patton's conclusions regarding the password on the ground that they represent inadmissible opinion testimony by a lay witness based on scientific, technical, or other specialized knowledge. However, the Court overrules this objection. The statement is relevant because it demonstrates what Patton believed; the Court does not consider it as evidence that Patton's belief was correct.

[5] Agunbiade objects to this factual allegation on the ground that it is irrelevant because it relates to another class with another professor. The Court overrules this objection, as the fact is relevant to show that this was not the only incident in which Agunbiade had difficulty accessing the computer system.

### C. NR322-Pediatric Nursing

In the fall of 2015, Agunbiade was a student in the NR322-Pediatric Nursing clinical course. Wallace was the professor responsible for teaching the classroom portion of the class. Wallace also supervised some, but not all, of the students in the clinical portion of the class. Agunbiade was one of the students assigned to Wallace's clinical.

On September 10, 2015, the first day of the clinical, Wallace noted that Agunbiade needed to improve his assessment of patients. On September 17, 2015, the second day of the clinical, Agunbiade arrived late. When Wallace questioned him about his tardiness, he said that he had been in the wrong area of the building and had been trying to find the rest of the group. Agunbiade had called another classmate for help, but not Wallace. Wallace allowed Agunbiade to participate in the clinical that day.

On September 17, 2015, Wallace discovered that Agunbiade and another student (Caucasian, female) were assigned to a particular patient and had taken that patient's vital signs approximately ninety minutes late. The students had not reported their error to Wallace or the staff nurses. As a result of this incident, Wallace gave both Agunbiade and the other student unsatisfactory evaluations for the day. Wallace also spoke with both students about their error. The case notes state that "[n]oted challenges occurred as the assignment had been split with another student" and "[i]mproved communication between students and faculty member are needed for the remaining clinical days." Dkt. No. 61-1 at 37. Agunbiade acknowledges that both students assumed responsibility for this incident, though notes that there is no suggestion that he was specifically at fault.

Due to Agunbiade's unsatisfactory performance, Wallace presented Agunbiade with a clinical contract on September 23, 2015. The contract required Agunbiade to improve his performance to receive a passing grade for the course.

On September 26, 2015, Mihwa McKinley, a student working on her Masters of Nursing Science, assisted Wallace in supervising the clinical students. McKinley reported to Wallace that she personally observed Agunbiade make several errors that day. McKinley documented these errors in an email to Wallace. The errors included: attempting to give a patient an incorrect dosage of medication; incorrectly reading an oxygen flow meter; failing to notice that a patient was not wearing his oxygen tubes but was instead laying on the tubes; failing to do neurological tests on a patient as ordered and being unable to explain what a neurological test entailed; turning off a patient's IV pump after incorrectly concluding that the infusion of fluids was complete; and leaving a room with a patient's bed raised, in violation of the unit's policy.

In his deposition, Agunbiade explained some of these incidents. He said that McKinley had asked him to read an oxygen meter that consisted of a small tube with a ball inside. The height of the ball indicated the appropriate reading. Agunbiade thought that the ball was between two numbers and estimated the reading as five liters. McKinley disagreed with his reading. Agunbiade then suggested that they turn the lights on in the room, but McKinley responded that he should not need to turn on the lights to correctly read the meter.

Agunbiade acknowledged that while he was bathing a patient, the patient's IV pump began beeping. Because the sound was upsetting the patient, which made him concerned for the patient's safety, Agunbiade turned off the alarm. Agunbiade then looked at the pump and saw that it said "complete," so he turned the pump off. Agunbiade later learned that Wallace had wanted an entire 1000 mL bag infused into the patient and set the alarm to go off (but the pump

to keep running) after the first 150 mL had been infused so that she could see how the patient tolerated the first part of the infusion. Wallace later told Agunbiade that turning the pump off had endangered the patient. Agunbiade blamed Wallace for not explaining the situation to him.

Agunbiade also noted that Wallace accused him of failing to take a vital sign at a particular time per the doctor's written instruction. According to Agunbiade, the doctor told McKinley that it was unnecessary to take the vital signs at specific times, but that the patient needed "constant supervision." McKinley passed these instructions on to Agunbiade. Wallace learned that the vital signs were not being checked as initially instructed and did not believe Agunbiade when he told her of the change. Agunbiade testified that Wallace "thought I was lazy. She believed I was troubled [sic] and I don't [sic] want to do it."[6] Dkt. No. 61-1 at 48.

After learning of the errors McKinley observed, Wallace concluded that it was too dangerous to allow Agunbiade to continue working his shift. As a result, she met with Agunbiade and instructed him to immediately leave the hospital due to his errors.

On October 2, 2015, Wallace met with Agunbiade and informed him that he would receive an "F" for the course because his performance in the clinical was unsatisfactory. Agunbiade was not given any documents when he was failed. Later that day, Agunbiade called his Student Support Advisor, Ivy Sawyer, and asked to withdraw from NR322 on the advice of his instructor. It is not uncommon for instructors at Chamberlain to advise a student to withdraw if the student is in danger of failing a course. Agunbiade then asked if he would receive a refund for the course. Sawyer advised Agunbiade that he would not receive a refund because his last

---

[6] Chamberlain characterizes this incident as one in which the doctor told Agunbiade of the change, and McKinley did not believe him; however the relevant deposition testimony, which both parties cite, suggests that the doctor had communicated with McKinley, not Agunbiade, and it was Wallace who disbelieved Agunbiade's description of what had occurred.

date of attendance in the class was in week five. Chamberlain's policy provides that if a student withdraws from a class with a last attendance date recorded between weeks five and eight of a session, the student will not receive a refund for that class.

Agunbiade believes he was treated differently than another student in the class, Jacki Lee. Lee, a Caucasian female student, was enrolled in NR322 at the same time as Agunbiade, but unlike Agunbiade, she was assigned to Professor Marcy Strine for the clinical portion of the class. On one occasion, Lee asked Strine for help administering a medication to a patient. Strine supervised Lee while she attached the secondary medication set to the primary IV line. Unfortunately, this process took longer than expected because Lee accidently touched the sterile end of the IV tubing, requiring her to start over. When Strine questioned Lee, she was aware of the mistake she made and was able to explain which portions of the IV tubing were to be sterile. In Strine's experience, touching the sterile end of the IV tubing is a typical error that students make. The end result was that the patient's medicine was administered a few minutes late. Strine concluded that this was a minor error as Lee had started the process at the appropriate time, but the process took longer than expected due to a routine error.[7] However, Strine gave Lee a "needs improvement" rating for the day and counseled her on the consequences of getting a second "needs improvement" rating.

---

[7] Agunbiade notes that Strine concluded that this was a routine error, while noting that Patton concluded that Agunbiade "was not providing a safe environment for patients in his care" when he missed a required medication administration, among other mishaps. Dkt. No. 60 at 6-7. The distinction Agunbiade attempts to draw is inapt. First, it is the touching of the sterile end of the IV tubing which is being characterized as a routine error, not the late or missed required medication administration. Second, the respective errors may be characterized differently (1) because they were characterized by different professors; and (2) one professor concluded that Lee was running late in administering the medication, whereas Agunbiade was determined to have missed the administration.

10

On another occasion, Strine found that Lee had failed to record the vital signs and administer medicine to a patient at the appropriate time because she had been giving another patient a bath which took longer than expected.[8] Strine questioned Lee to determine whether she had forgotten to perform a task—which is a serious issue—or whether Lee was running late on completing tasks because they were taking longer than she anticipated, which is a common error for novices. When Lee was able to list all the tasks that she was to complete that day, Strine concluded that Lee's error was merely a failure to properly prioritize tasks.

Strine gave Lee a passing grade for the clinical portion of NR322.[9]

### D. Additional Allegations of Discrimination

Agunbiade asserts that Chamberlain treated him differently than other students with regard to class attendance. He states that on one occasion, Professor Sherry refused to allow him to enter a class when he arrived approximately five minutes late. He acknowledges that she allowed him to rejoin the class after the first break. Agunbiade did not fail Professor Sherry's

---

[8] Agunbiade again compares this incident to his own missed required medication administration. For the reasons stated above, the Court again finds this distinction inapt.

Additionally, Agunbiade stated in his deposition that Ibukun Oyenuga, a female Nigerian student, told him about this incident. Dkt. No. 61-1 at 53. However, Oyenuga's declaration describes "an incident, in a make-up clinical, in which Jacki Lee admitted to clinic instructor Jackson that she failed to administer medication to a patient. Lee was crying and apologizing for missing the medication. However, [she] did not observe Jackson to [sic] become angry with Lee, to scold her, or to speak harshly to Lee. Jackson told Lee that Professor Wallace would have to decide if Lee would pass the clinical." Dkt. No. 62. Jackson is not otherwise referenced in Agunbiade's briefing.

[9] According to her declaration, Wallace concluded that the errors that Strine observed in Lee's performance were less serious than the errors Wallace found in Agunbiade's performance. Dkt. No. 47-5. Agunbiade asserts that these facts, as laid out by Chamberlain, establish "[b]y admission, . . . *Wallace* made the final decision that [Agunbiade] should fail while Lee passed NR322." Dkt. No. 60 at 7. This is an overstatement, as Wallace, in her affidavit, states that she agreed with Strine's conclusions regarding Lee's performance in the clinical portion, but that "Strine gave Lee a passing grade for her clinical and [Wallace] gave Lee a passing grade for the didactic portion of NR322." Dkt. No. 47-5 at 3-4.

class. On another occasion, Agunbiade observed Sherry allowing a Caucasian female student to enter a class after arriving approximately eight minutes late. The Caucasian female student thanked Sherry, saying "This is a privilege. I know I don't deserve it, but thank you. I know I'm late." Dkt. No. 61-1 at 32. Agunbiade also claims that a Caucasian male student was late for a different class and was allowed to enter the classroom.

Agunbiade also notes that one instructor, Ms. Smith, would spend one or two hours teaching other students how to insert an IV, but Agunbiade had trouble getting Smith to spend a similar amount of time teaching. "For example," Agunbiade explained in his deposition, "if [Smith] spent one hour with other students, hardly she would be ready to spend five minutes, ten minutes with me. She wants to go." Dkt. No 61-1 at 16. Likewise, Agunbiade notes that he was "taken off" of his first IV by Smith because of a mistake, but personally observed other students making mistakes on their first IVs, without being "taken off."[10]

### III. DISCUSSION

Agunbiade asserts two causes of action against Chamberlain, one for discrimination based on race, color, and national origin under Title VI of the Civil Rights Act ("Title VI"), 42 U.S.C. § 2000d, *et seq.*, and one for sex discrimination under Title IX of the Education Amendment Act of 1972 ("Title IX"), 20 U.S.C. § 1681, *et seq.* Title VI and Title IX prohibit intentional discrimination. *See Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 173 (2005) (Title IX); *Alexander v. Sandoval*, 532 U.S. 275, 280 (2001) (Title VI). The parties agree that claims under these statutes are treated the same as claims under Title VII and therefore the "sole

---

[10] Agunbiade also writes that "on a number of occasions, professors would instruct [him] to leave, while remaining with the other students to continue instruction," and that "on at least one occasion another student was assigned to report on Agunbiade." Dkt. No. 60 at 10. Details of these incidents, however, are not provided.

question that matters" is "[w]hether the evidence would permit a reasonable factfinder to conclude that [Agunbiade's] race, ethnicity, sex, . . . or other proscribed factor caused the . . . adverse . . . action[s]." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016) (Title VII case); *see also* Dkt. No. 60 at 12; Dkt. No. 63 at 2.[11] Likewise, both parties agree that Agunbiade suffered adverse actions, specifically his failure of NR324 and NR322, resulting in his withdrawal from Chamberlain.

Agunbiade's argument throughout his brief is that

Agunbiade, the lone African, Black, Nigerian male in his classes, was repeatedly and consistently subject to more demanding standards, and afforded less favorable treatment, than the White, Caucasian women who were his classmates.

While a reasonable juror might not conclude that a single such incident showed intentional discriminatory animus, by the time that juror reaches the[] end of Agunbiade's repeated examples, it would be much more reasonable – in fact, nearly unreasonable – to attribute the actions to any other innocent, non-discriminatory motive.

Dkt. No. 60 at 20. The Court will consider this argument with regard to each of the adverse events discussed below.

### A. NR324-Adult Health I

With regard to NR324, Agunbiade argues that Chamberlain treated him differently than his classmates, all of whom were female Caucasians.[12] There is, however, no evidence to support this claim.

---

[11] The Court recognizes Chamberlain's emphasis on the *McDonnell Douglas* burden-shifting framework; however, Agunbiade does not rely on that framework, and thus the court will not address it. *See, e.g.*, *David v. Bd. of Trustees of Cmty. Coll. Dist. No. 508*, 846 F.3d 216, 224 (7th Cir. 2017) (considering the arguments under the framework utilized by the non-moving party).

[12] One example provided by Agunbiade is that Lee was given weekly evaluations which detailed her communication difficulties, whereas Agunbiade was not. This example, however, was based on the ICRC findings, which the Court considers unreliable; indeed, even in that

13

For example, Agunbiade details his lack of computer access, noting that:

> On the first day of Agunbiade's NR324 clinical, under Patton, all the students' passwords failed to function. While Patton reset the password for all the other students, she did not reset Agunbiade's. Instead, Patton took Agunbiade to a computer "a couple of times," but she simply left him alone, and his password still wouldn't work.
> As a student, Agunbiade understood that he could not go directly to computer technical support staff on his own. Instead, he asked Patton, his clinical instructor, that he needed clinical assistance, but she failed to go with Agunbiade when he requested it. Agunbiade was the only student who did not have a password throughout the majority of the class.

Dkt. No. 60 at 17 (internal citations omitted). However, Agunbiade points to no evidence that supports his belief that he could not resolve his password issue without Patton, nor does he point to any evidence that Patton accompanied any other student to get technical support. In any event, Patton had numerous issues with Agunbiade's clinical performance, and, in light of those issues, which Agunbiade acknowledges, no reasonable fact-finder could look at Agunbiade's lack of computer access and conclude that Patton failed him because of his race, color, national origin, and/or sex.

### B. NR322-Pediatric Nursing

The basis for Agunbiade's claim regarding NR322 is Wallace's comment regarding potassium and the ways in which Wallace's treatment of him differed from his Caucasian female classmates, who he says made up the rest of the class.[13]

To begin, Agunbiade describes what he calls the "Accent Kerfuffle" as Wallace's "motive" for failing him in NR322, writing:

> In late March 2014, [Agunbiade] took a clinical laboratory taught by Professor Sarah Wallace. Agunbiade was the only African, Black, male student

---

document, there is no evidence to suggest that Lee received such an evaluation from Patton or for NR324.

[13]However, Ibukun Oyenuga, a female Nigerian student, appears to have also been in the class. Dkt. No. 62.

in the class. He was also the only student with an accent. At one point during the class, Wallace said to the class, "Can you imagine some people that cannot pronounce the word 'potassium'?" Wallace was "just talking on a different topic related to the class. All of a sudden she stopped. She said, "Can you imagine a black friend that cannot even pronounce the word 'potassium.'" Wallace's remark made Agunbiade uncomfortable. He wanted Wallace's comments to stop so he could be comfortable in the class.

      The following day, Agunbiade reported the incident to Student Services Advisor Ivy Sawyer. Sawyer encouraged Agunbiade to speak to Wallace about the incident, but Agunbiade demurred at that time, stating that he "[didn't] want to make it about [himself], because she did not mention [his] name." However, Agunbiade felt uncomfortable because he "belong[ed] to the minority that she was talking about, and I happen to be the only black, the only immigrant, the only male student in that group."

      Ultimately, though, Agunbiade did speak to Wallace about the incident. He told her that he didn't want to make the incident personal, but that he wanted the "kind of comment that make[s] minorities uncomfortable in class not to be continued." When Wallace refused, Agunbiade asked her to talk to her immediate supervisor, Manager of Student Affairs Geoff Robinson.

      Perhaps three days later, Agunbiade received an email from the school's administration essentially repeating Sawyer's advice to discuss the issue with Wallace. Agunbiade did not reply to the email.

      At Agunbiade's next clinical lab with Wallace, Wallace told the class that she was "not happy" because someone in the class had reported her inappropriate comment to the administration. Wallace was "really annoyed." Wallace told the class she did not like students reporting her to the administration, and instructed the students that if anything offended them, they should come to her first. (*Id.*, p. 47:6-10).

Dkt. No. 60 at 18-19 (internal citations and footnotes omitted). While Agunbiade provides a description of the event, he does not explain how this event, which occurred in March 2014, relates to or causes his failure of NR322 in October 2015. *See Loudermilk v. Best Pallet Co., LLC*, 636 F.3d 312, 315 (7th Cir. 2011) ("The closer two events are, the more likely that the first caused the second.").[14]

---

[14] Agunbiade argues that:

Second, Agunbiade argues that Wallace treated him and his Caucasian female classmates differently when (1) he and a Caucasian female classmate were ninety minutes late in checking a patient's vital signs; and (2) she considered the severity of his errors.[15] However, with regard to the vital signs, both students received unsatisfactory evaluations for the day, and that they may have received different grades for the clinical portions of the course is irrelevant because Agunbiade has not shown that their overall performance was similar.[16] Next, with regard to whether Agunbiade and Lee were subjected to different standards, such a comparison is

---

> Even though [Wallace] did not mention Agunbiade by name, and, in fact, specifically phrased the comment as though it applied to someone outside of the class, Wallace's remark was a complete *non sequitur* in its context, and it was rendered in a class in which a single student – Agunbiade – was a foreigner who spoke English with a noticeable accent.

Dkt. No. 60 at 20. However, Agunbiade does not cite any evidence to support the contention that the remark referred to Agunbiade, and in fact, Agunbiade did not believe the remark to be about him. Furthermore, even if he did, there is still insufficient evidence which a reasonable fact-finder could use to relate this comment to a class failed a year and a half later, with a passing grade given by Wallace to Agunbiade in between.

[15] Agunbiade also describes:

> One incident, about which Chamberlain makes much, [which] involved Agunbiade recording a patient's oxygen flow as "5" while his clinical instructor insisted that the correct reading was "7." Agunbiade noted that the physical arrangement of the flow meter was such that the observer frequently had to make a judgment as to what number the ball was closest to. Agunbiade also stated that the room was very dark, and he asked to turn the light on, but McKinley refused.
>
> Nothing in Agunbiade's file ever refers to this issue being discussed in the weekly C/ELE session.

Dkt. No. 60 at 17 (internal citations and footnotes omitted). It is unclear to the Court how this incident is intended to show discrimination.

[16] Agunbiade asserts that the Caucasian female student should have had to sign an academic contract like he did because she had three issues of care in two weeks. However, Agunbiade does not cite to evidence that supports that assertion. Furthermore, Agunbiade had been tardy to class and needed to improve his assessment of patients. Without further details, a reasonable fact-finder could not determine whether the two students were similarly situated.

irrelevant because the two students had different decision-makers determining their grades. *See Ellis v. United Parcel Serv., Inc.*, 523 F.3d 823, 826 (7th Cir. 2008) ("Different decisionmakers may rely on different factors when deciding whether, and how severely, to discipline [a student]. So, to be similarly situated, a [student] must have been treated more favorably by the same decisionmaker . . . .").[17] Thus, viewing the evidence as a whole, no reasonable fact-finder could determine that Agunbiade failed NR324 because of his race, color, national origin, and/or sex.

### C. Agunbiade's Withdrawal

Agunbiade argues that by the time he failed NR324 and NR322, he believed "that Chamberlain, or at least a fair number of its teachers, intended to see that he failed, Agunbiade withdrew from Chamberlain and sought to enroll elsewhere." Dkt. No. 60 at 13. Construing this language as a request that the Court treat Agunbiade's withdrawal as an adverse event, the Court will consider the additional incident outside of NR324 and NR322 cited by Agunbiade.

In this regard, Agunbiade writes:

> Agunbiade arrived approximately five minutes late for a class taught by Professor Sherry. Sherry required Agunbiade to remain in the hall outside the classroom until the first regularly scheduled break in the class. However, Agunbiade personally observed that a female Caucasian student, who arrived at least *eight* minutes late, was admitted to a class immediately. On another occasion, Agunbiade overheard a female, Caucasian student thank the professor for being allowed to enter the class after arriving late. The female student referred to her admission as "a privilege" that she "didn't deserve."

---

[17] Furthermore, even were this not the case, there are additional differences between the students. According to Strine, Lee was twice late in completing her tasks because she struggled to sterilize the IV tubing and had a bath run long. According to Wallace, Agunbiade's errors included: attempting to give a patient an incorrect dosage of medication; incorrectly reading an oxygen flow meter; failing to notice that a patient was not wearing his oxygen tubes but was instead laying on the tubes; failing to do neurological tests on a patient as ordered and being unable to explain what a neurological test entailed; turning off a patient's IV pump after incorrectly concluding that the infusion of fluids was complete; and leaving a room with a patient's bed raised in violation of the unit's policy.

Dkt. No. 60 at 17-18. Unfortunately for Agunbiade, there is no evidence to suggest that Agunbiade was similarly situated to these students, or, in the case of the second of these incidents, that they even involved the same decision-makers. Even combining this incident with those discussed above, there is still insufficient evidence to suggest to a reasonable fact-finder that discrimination based on national origin, race, color, and/or sex led to Agunbiade's withdrawal.

## IV. CONCLUSION

For the reasons set forth above, Chamberlain's motion for summary judgment, Dkt. No. 46, is **GRANTED**.

SO ORDERED: 8/24/18

_William T. Lawrence_

Hon. William T. Lawrence, Judge
United States District Court
Southern District of Indiana

Copies to all counsel of record via electronic notification